UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSHUA N. REESE,<br><br>    Petitioner,<br><br>v.<br><br>DONALD HOLBROOK,<br><br>    Respondent. | CASE NO. 3:16-cv-05311-BHS-JRC<br><br>REPORT AND RECOMMENDATION<br><br>NOTED FOR: APRIL 27, 2018 |

   The District Court has referred this petition for a writ of habeas corpus to United States Magistrate Judge J. Richard Creatura. The Court's authority for the referral is 28 U.S.C. § 636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR3 and MJR4. Petitioner Joshua N. Reese filed the petition pursuant to 28 U.S.C. § 2254.

   Petitioner has filed a habeas petition alleging that he was convicted based on insufficient evidence, that his 4th Amendment protection against unwarranted searches and seizures was violated, and that he received ineffective assistance of trial counsel. However, petitioner has filed his petition well after the one year statute of limitations expired. Though he was pursuing state

remedies during that time, the state courts ultimately determined that his state filings were improper, precluding statutory tolling. He has further failed to demonstrate any basis to apply equitable tolling. Therefore, because it was filed more than one year after petitioner's judgment was final and no tolling applies, the Court recommends that petitioner's habeas petition be denied as untimely.

## BASIS FOR CUSTODY AND FACTS

Petitioner was convicted of murder in the first degree, two counts of robbery in the first degree, two counts of assault in the second degree, and one count of burglary in the first degree. Dkt. 11, Ex. 6. He was sentenced to an exceptional sentence of 1200 months imprisonment and is currently incarcerated in the Washington State Penitentiary. *Id*.

The Washington State Court of Appeals stated the facts of petitioner's case as follows:

> Joshua Nathan Reese and his three associates, including Amanda Knight and Kiyoshi Higashi, saw James Sanders' Craigslist posting offering to sell a diamond wedding ring, surmised that James and Charlene Sanders had other valuables in their house, and planned to "rob" them by doing a "normal house lick."[1] On April 28, 2010, Knight drove Reese, Higashi, and Clabon Berniard in her car to the home of James and Charlene Sanders and their children, CK, aged 10, and JS,[2] aged 14. Knight and her passengers carried zip ties; Reese, Bemiard, and Higashi also carried loaded handguns. Before entering the house, Knight used a Bluetooth device to establish a cell phone connection with Reese and Berniard, who

---

[1] In his police interview, Reese described the robbery plan as follows:

[REESE:] The whole plan was, seen [sic] the ad on Craig's List [sic] for a ring. So the whole plan was, to get inside the house, 'cause if they got an expensive rin on Craig's List [sic], obviously they got something more expensive inside the house. *So the plan was just go inside the house and take everything out of the house*. That was it. I'm saying *the plan was . . . just go in there, basically, a normal what you'd call a robbery*. [. . .]

[POLICE:] Okay.

[REESE:] Street term, house lick, *just a normal house lick*. That's basically all it was.

[Footnote by Court of Appeals] (emphasis in original)

[2] It is appropriate to provide some confidentiality in this case. Accordingly, we use initials to identify the juveniles involved. [Footnote by Court of Appeals]

REPORT AND RECOMMENDATION - 2

remained in her car to listen for the code words "get down," the signal that they could enter the house and take the Sanders' valuable property.

Charlene and James Sanders[3] and their two boys were watching a movie upstairs while waiting for the prospective buyer who had responded to the Craigslist posting. Knight and Higashi approached the Sanders' home, claiming to be the prospective buyers of the ring. James came downstairs to greet them. Eventually, James called Charlene to the downstairs kitchen to answer Knight's questions about the ring.

Charlene answered Knight's questions and then handed the ring to her. Higashi asked Knight if she wanted the ring; Knight responded, "[Y]es." Higashi pulled out a "wad of cash" and said, "How about this?" He then pulled out a gun and said, "How about this?" James and Charlene told Higashi and Knight to "[t]ake it," "just take everything." Higashi and Knight ordered James and Charlene to "[g]et down," forced James and Charlene face down to the floor with their hands behind their backs, restrained their wrists with zip ties, and ripped their wedding rings off their fingers.

Charlene heard two more people "rushing in" and she "heard commotion" throughout the house. Two men with guns, later identified as Reese and Berniard, entered the upstairs bonus room where CK and JS were watching the movie. The men pointed their guns at CK and JS, "pulled [them] really fast downstairs" by their wrists, and laid them face down on the kitchen floor with their hands behind their backs.[4] One of the men with a gun began yelling at Charlene and asking her, "Where is the safe?" Charlene and James again implored, "Just take everything; just take everything." The man responded, "I'll kill you; I'll kill them." When Charlene looked up to find her children, several of the intruders ordered her to lie "facedown."

Berniard called Charlene a "b*tch," kicked her in the head, stood over her, pointed a gun to the back of her head, cocked its hammer, and started counting down from three, demanding to know where the family's safe was located. Charlene thought she was going to die. When Berniard reached "[one]," Charlene told him they had a safe; and James gave Berniard a fake code. Berniard announced to his fellow intruders, "They have a safe," and then demanded to know where the family's second safe was located. Charlene told him they did not have a second safe.

Berniard and another male intruder picked James up off the floor and led him into the laundry room near the garage. CK and JS stood up; and JS followed the men and his father into the laundry room. Before they reached the garage, James broke

---

[3] We refer to Charlene and James Sanders by their first names for clarity. We intend no disrespect. [Footnote by Court of Appeals]

[4] Unlike their parents, however, CK's and JS's hands were not restrained with zip ties. [Footnote by Court of Appeals]

REPORT AND RECOMMENDATION - 3

free from his zip ties and started punching Berniard. Berniard shot his gun at James, a piece of James's ear flew off, and he fell unconscious to the floor. Charlene heard "two or three" gunshots and later learned that James had been shot three times.

JS jumped on Berniard's back and started choking and fighting him. Berniard "pistol whipped" JS three or four times on the head, leaving him with a concussion; bruises on his neck, face, and arms; and a gash and scar behind his left ear. Two of the male intruders dragged James's body into the living room. After quickly rummaging through the family's belongings upstairs, all four intruders fled out the front door.

Charlene found James in the downstairs living room, gasping for air. With her zip ties still on, she called 911. Paramedics arrived and pronounced James dead. Charlene had suffered an injury to her left temple, which required a CAT scan. Detective John Jimenez and members of the Pierce County Sheriff's Department homicide team initially processed the scene. Jimenez found the contents of a woman's purse dumped out on the upstairs furniture, blood stains and two shell casings near James's body in the living room, a shell casing on the kitchen floor, and hair and blood spatter on the pattern molding near the living room door. The officers determined that the following valuable items had been stolen from the Sanders' home: the old wedding ring that James had posted on Craigslist, Charlene's and James's wedding rings, Charlene's wallet, JS's and Charlene's cell phones, a Playstation 3, an iPod touch, and an iPod charger bearing the initials "J–A–S."

Around 10:30 or 11:00 PM that same night, Knight dropped off Higashi at his girlfriend Jenna Ford's house. Ford noticed that Higashi had two handguns, a wallet, another person's cell phone, and a bunch of receipts in his possession. After reading the news online, Higashi called Knight, who returned with Reese in her white Crown Victoria so the three could "get a story together." The next morning, Knight picked up Higashi at Ford's house. Later that day, Higashi texted Ford and told her that he was out of state. Ford eventually reported Higashi and his whereabouts to the authorities.

The morning of May 1, Daly City, California Police Officer Eddy Klier observed Knight driving a white Crown Victoria without a front license plate (in violation of California Vehicle Code (CVC) § 5204), made a U-turn, got behind Knight's vehicle, and followed it. Before turning on his emergency lights, Klier noticed that the front passenger, Reese, was not wearing his seat belt (in violation of CVC § 27315). When Knight stopped in response to Klier's emergency lights, Reese immediately opened the front passenger-side door and got out. Klier ordered Reese to get back inside the car; and Reese complied. Klier asked Reese for identification, which Reese claimed he did not have. Klier asked Reese for his name; Reese responded that his name was "Niako Hatt," which did not match any records in the police system. While talking with Reese, Klier had observed Reese

reach his left hand several times into his waistband; Klier was concerned for his safety because Reese was wearing a large black coat and bulky clothes capable of concealing a weapon. Higashi was in the backseat.

When backup arrived, Klier asked Reese to get out of the car so he could conduct a "pat-down search" for weapons and identification. Reese stood up, removed his coat, tossed it on the front passenger seat, removed an unknown object from his rear left pant leg, and handed it to Higashi in the backseat. Believing the concealed object might be a weapon or drugs, Klier detained all three occupants for further investigation and conducted a pat down search of Reese. Klier found nothing on Reese's person but later found several bags of marijuana in his coat pocket.

Knight consented to a search of her Crown Victoria, including a backpack inside, which she claimed was hers. Under the vehicle's front passenger seat where Reese had been seated, the officers found a loaded .22 caliber handgun with a red bandana on its handle. Inside Knight's backpack, the officers found a concealed weapons permit belonging to Knight and two boxes of .380 caliber and .22 caliber ammunition. Reese admitted knowing that the .22 caliber handgun was under his seat, but he denied that it belonged to him. The officers seized the .22 caliber handgun and the ammunition from Knight's backpack; arrested Knight, Higashi, and Reese; and booked them into the San Mateo County jail. Daly City police officers notified the Pierce County Sheriffs [sic] Department that they had arrested three people matching the description of the suspects in the Sanders robbery.

On May 4 and 5, Pierce County Sheriff's Department Detective Jimenez and Lieutenant Todd Karr interviewed Reese in the San Mateo County jail. After waiving his *Miranda*[5] rights, Reese gave two taped statements. Reese admitted that (1) he and his fellow intruders had seen James's Craigslist posting, had believed James and Charlene had more "expensive" items inside their house, and had planned to "rob" them; (2) he (Reese) had called Berniard and asked him to help do a house "lick"; (3) their plan was to "go inside the house and take everything out" but for "nobody to get hurt"; and (4) during the robbery, Reese, Higashi, and Berniard each had loaded handguns and zip ties, and they were using Bluetooth devices to communicate with Knight. Claiming he had been "upstairs the whole time," Reese denied having hit or kicked anyone inside the house. Although Reese had heard "yelling" and "gunshots" downstairs, he did not know who had shot James.

Pierce County police officers eventually searched Knight's car and her backpack to collect evidence from the Sanders home invasion robbery. Inside the car, they found jewelry, a camera, four cell phones, electronic equipment, a laptop computer, an iPod, and an iPod charger bearing the initials "JAS." Inside Knight's backpack, they found the two boxes of .22 and .380 caliber ammunition that

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966). [Footnote by Court of Appeals]

REPORT AND RECOMMENDATION - 5

    California police officers had previously discovered, two Bluetooth devices, and several credit cards.

    Ford's sister found Charlene's wallet and JS's cell phone in Ford's bedroom-and told her mother, who called police. Officers found the SIM[6] card for JS's cell phone at a house in Kent; they found Charlene's cell phone discarded along the Valley Freeway. A California police officer discovered that Knight had pawned James's wedding ring at a local pawn store; and the wedding ring that James had listed on Craigslist was discovered at a San Francisco pawn store.

    On May 12, Pierce County police officers served a search warrant on the B & I shopping center in Tacoma, Washington, where they found (1) a .380 caliber handgun, holster, magazine, and ammunition, which Higashi, Knight, and Reese had sold to store manager James Matter on April 29; (2) a Playstation 3, which Knight had sold to Matter the same day; and (3) a surveillance video from April 29, showing all three suspects. The suspects had also tried to sell Matter a .22 caliber handgun, which he did not purchase.

    A forensic scientist later examined the .380 caliber handgun that the police had recovered from the B & I shopping center. He determined that the handgun was operable and that the three cartridges recovered from the crime scene and the three bullet fragments recovered from James's body had been fired from this handgun. The medical examiner concluded that (1) James had died of "multiple gunshot wounds," including wounds to his left knee, groin, and back; (2) the gunshot wound to James's back was fatal; and (3) James's death a homicide.

Dkt. 11, Ex. 20 at 2-8; *State v. Reese*, No. 42305-7-II, 2013 WL 5592952 at *1-*4 (Wash. App. Div. II October 8, 2013) (citations to the record omitted).

    Petitioner was charged with murder in the first degree, two counts of robbery in the first degree, two counts of assault in the second degree, and one count of robbery in the first degree. Dkt. 11, Ex. 6. He was found guilty of all counts at a bench trial, and found guilty of a special verdict for the use of a firearm in connection with the crimes. *Id*. He was given an exceptional sentence of 1200 months imprisonment. *Id*.

---

[6] A SIM card is a small card that contains a mobile network subscriber's account information.

REPORT AND RECOMMENDATION - 6

|   |   |
|---|---|
| 1 | **PROCEDURAL HISTORY** |
| 2 | Petitioner appealed his conviction, alleging it was improper based on the same grounds |
| 3 | that he raises in this habeas petition. Dkt. 11, Ex. 18. The Court of Appeals denied his appeal |
| 4 | (*Id*., Ex. 20) and petitioner filed a petition for discretionary review with the Washington Supreme |
| 5 | Court (*Id*., Ex. 21). That Court denied review (*Id*., Ex. 22) and petitioner's conviction became |
| 6 | final on February 5, 2018, with a mandate issued on February 19, 2014 (*Id*., Ex. 23). |
| 7 | On February 18, 2015, petitioner filed his personal restraint petition ("PRP"). *Id*., Ex. 24. |
| 8 | He subsequently asked permission to file a supplement for his PRP. *Id*., Ex. 25. The |
| 9 | Commissioner of the Division Two Court of Appeals granted permission to file a supplement, |
| 10 | but warned petitioner that filings of supplements after the one year statute of limitations could |
| 11 | make his petition untimely under RCW 10.73.090. *Id*., Ex. 26. The Commissioner again warned |
| 12 | petitioner about implicating the statute of limitations when petitioner filed a motion to amend. |
| 13 | *Id*., Exs. 27, 28. The Court of Appeals ultimately determined that petitioner's PRP was a |
| 14 | "mixed" petition, with both timely and untimely grounds raised. *Id*., Ex. 35. Therefore, pursuant |
| 15 | to Washington case law and RAP 16.11, the Court of Appeals dismissed petitioner's PRP as an |
| 16 | improperly filed, mixed, and untimely petition in February of 2016. *Id*. |
| 17 | Petitioner filed a motion to modify the ruling, which the Court of Appeals converted to a |
| 18 | motion for discretionary review and transmitted to the Washington Supreme Court. *Id*., Exs. 36, |
| 19 | 37, 39. The Commissioner of the Washington Supreme Court denied review, noting that, though |
| 20 | one ground in his petition was timely, the rest were not and the Court of Appeals did not err |
| 21 | when it dismissed his PRP as mixed and untimely, thereby making the petition an improper |
| 22 | filing. Dkt. 24, Ex. 47 at 2. Petitioner filed a motion to modify the ruling (*Id*., Ex. 48), which the |
| 23 |   |
| 24 |   |

REPORT AND RECOMMENDATION - 7

1 Court denied (*Id.*, Ex. 49). The Washington Supreme Court entered a certificate of finality on
2 October 12, 2017.
3 On April 25, 2016, while petitioner's PRP was still before the Washington courts,
4 petitioner filed his federal habeas petition. Dkts. 1, 5. In November of 2016, the Court ordered
5 the habeas proceedings stayed pending the outcome of petitioner's PRP in the Washington
6 courts. Dkt. 12. In December of 2017, the Court lifted the stay on the proceedings and invited the
7 parties to submit additional briefing. Dkt. 18. Both parties submitted additional briefing and
8 evidence. Dkts. 22-25.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). However, petitions under § 2254 are governed by the statute of limitations prescribed by 28 U.S.C. § 2244. "When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 244(d)(2)," and the District Court will not examine the merits of the petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005).

## EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle

1  the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. A hearing is not required if
2  the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d). *Id*.

3  Here, petitioner's claims rely on established rules of constitutional law. It was untimely
4  filed and the Court will not make any determinations based on the merits of the case. Therefore,
5  the Court concludes that an evidentiary hearing is not necessary to decide this case and
6  petitioner's claims may be resolved on the existing state record.

## DISCUSSION

### I. Timeliness of Habeas Petition

Respondent argues that petitioner's habeas petition is untimely. AEDPA established a statute of limitations for petitions filed by prisoners challenging their custody under a state court judgment and sentence. 28 U.S.C. § 2244(d). Where the challenged judgment became final after April 24, 1996, a petitioner must file his petition within one year from "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). For purposes of 28 U.S.C. § 2244(d)(1)(A), direct review generally concludes and the judgment becomes final either upon the expiration of the time for filing a petition for writ of certiorari with the Supreme Court, or when the Court rules on a timely filed petition for certiorari. *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). Thus, if a case could be appealed to the Supreme Court, the statute of limitations begins to run when the 90 days to seek certiorari expire. *Id*. at 1159. Further, "[t]he time during which a properly filed application for state post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2); *see also Pace*, 544 U.S. at 413-14.

1        Here, petitioner has filed an untimely habeas petition. Petitioner's conviction became

2 final on February 5, 2014. Dkt. 11, Ex. 22. Thus, because petitioner did not petition the Supreme

3 Court for a writ of certiorari, the statute of limitations began running ninety days later, on May 6,

4 2014. Therefore, petitioner had until May 6, 2015 to file his habeas petition. However, as noted

5 above, petitioner did not file his petition until April 25, 2016, almost a year after the statute of

6 limitations had run. Petitioner argues that the time he spent in the Washington courts, beginning

7 with his PRP filed in February of 2015, should toll the statute of limitations. However, the time

8 spent in state court will toll the one year time limit only if the proceeding before the state court is

9 properly filed. *Pace*, 544 U.S. at 513-14. Both the Court of Appeals and the Washington

10 Supreme Court dismissed petitioner's PRP as improperly filed because it was mixed and

11 untimely. Dkt. 11, Ex. 20; Dkt. 24, Ex. 47. Further, the Court of Appeals warned petitioner that,

12 even though his initial filing has timely, his supplement could cause it to become untimely under

13 Washington law. *See* Dkt. 11, Exs. 26, 28. He chose to proceed, knowing his PRP could become

14 time barred.

15        A petition that has been dismissed for being mixed and untimely is not properly filed and

16 thus cannot be used to toll the statute of limitations. *See Vorak v. Miller-Stout*, No. C11-5181

17 RJB/KLS, 2011 WL 3664900 at *4 (W.D. Wash. 2011). It is not the job of this Court to second

18 guess a state court's procedural mechanisms, only to determine whether the state court

19 recognized petitioner's pleadings as proper filings. Because petitioner filed his habeas petition

20 well after the one year statute of limitations expired, and because his state proceeding was not

21 properly filed and thus does not toll the statute of limitations, the Court recommends finding

22 petitioner's habeas petition untimely.

## II. Equitable Tolling

Respondent also argues that petitioner has not demonstrated that his habeas petition should be equitably tolled. The statute of limitations may be subject to equitable tolling if the petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (quoting *Pace*, 544 U.S. at 418). To gain the benefit of equitable tolling, extraordinary circumstances beyond a petitioner's control must have prevented the petitioner from filing a federal petition on time. *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc); *Gaston v. Palmer*, 387 F.3d 1004, 1008 (9th Cir. 2004); *Laws v. Lamarque*, 351 F.3d 919, 923-24 (9th Cir. 2003); *see also Miranda v. Castro,* 292 F.3d 1063, 1065 (9th Cir. 2002) (petitioner bears the burden of establishing his entitlement to equitable tolling).

Here, petitioner has not demonstrated any extraordinary circumstance outside his control that prevented him filing on time. As noted above, petitioner's statute of limitations expired on May 6, 2015. Yet, he did not file his habeas petition until April of 2016. During that time he filed numerous requests with the state courts, including motions for extensions and motions to supplement, knowing that a supplement could bar his PRP as untimely. *See* Dkt. 11, Exs. 24, 25, 27, 30, 32. Arguably he was diligently pursuing his rights. Indeed, he notes in his supplement that he believed the Court of Appeals should not have dismissed his petition, but rather should have heard the merits on his original, timely filed ground. Dkt. 25 at 6-7. However, even a petitioner who spends years trying, in good faith, to exhaust his state court remedies only to discover that his filing improper does not, by itself, justify the application of equitable tolling. *See Pace*, 544 U.S. at 416-18. Petitioner must show that he failed to file his habeas petition on time because of some extraordinary outside force – something petitioner did not do here.

1 | Therefore, the Court recommends declining to implement equitable tolling and finding
2 | petitioner's habeas petition untimely.

### CERTIFICATE OF APPEALABILITY

Petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only if petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Pursuant to this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to this petition.

### CONCLUSION

For the reasons set forth above, the Court recommends finding petitioner's habeas petition untimely, finding that equitable tolling is not applicable, and dismissing petitioner's habeas petition with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

1 | imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on April
2 | 27, 2018, as noted in the caption.

3 | Dated this 2nd day of April, 2018.

J. Richard Creatura
United States Magistrate Judge